# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL NO. 4:15-CR-249 |
| v. | : (Chief Judge Conner) |
| DAVID PIAQUADIO, | : |
| Defendant | : |

## **MEMORANDUM**

Defendant David Piaquadio ("Piaquadio") was charged by indictment with one count of conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 (Count One), and three counts of possession with intent to distribute and distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts Two through Four). The indictment charges that from January 2011 through April 28, 2015, Piaquadio knowingly and intentionally conspired to distribute Oxycodone tablets, Fentanyl patches, and heroin, and that serious bodily injury resulted from the use of those controlled substances. It further charges that Piaquadio possessed with intent to distribute, distributed, or attempted to distribute Oxycodone or Fentanyl on three occasions—October 1, 2014, November 26, 2014, and March 12, 2015—and that serious bodily injury resulted from use of the controlled substances distributed on March 12, 2015.

On July 1 and July 2, 2019, the court held a non-jury trial in the above-captioned matter. The following memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Criminal Procedure 23(c).

For the reasons set forth below, the court finds defendant David Piaquadio ("Piaquadio") guilty of Counts One through Four of the indictment.

I. **Findings of Fact**

The evidence adduced at trial falls into two categories: fact witness testimony and documentary evidence concerning the crimes alleged, and testimony from medical doctors on the issues of causation and serious bodily injury. The court's findings within each category of evidence follow.

A. **Chronology of Events**

Physicians at the Wellsboro Health Center prescribed Oxycodone tablets and Fentanyl patches to Piaquadio and his then-girlfriend Jane Flynn ("Flynn") for chronic pain management. To receive these prescriptions, Piaquadio signed a contract acknowledging the terms and conditions for use of controlled substances including, *inter alia*, that selling or distributing his prescription medications to others is prohibited.

On October 1, 2014, Piaquadio filled prescriptions for Oxycodone and Fentanyl at a pharmacy in Wellsboro, Pennsylvania. As Piaquadio left the pharmacy, a confidential informant[1] introduced undercover Pennsylvania State Trooper Ryan Stillman Kelley ("Trooper Kelley") to Piaquadio in the parking lot. Piaquadio, Trooper Kelley, and the confidential informant sat in Trooper Kelley's vehicle, where Piaquadio provided Trooper Kelley with two Fentanyl patches and ten Oxycodone pills in exchange for $290 in prerecorded currency.

---

[1] During trial, the confidential informant was identified as Piaquadio's cousin, Katelyn Piaquadio ("Katelyn").

2

Trooper Kelley and Piaquadio maintained contact through text messages and phone conversations. On November 26, 2014, Trooper Kelley arrived at Piaquadio's residence for a prearranged drug transaction. Flynn, John Proctor ("Proctor"), and Piaquadio's son, Garrett Piaquadio ("Garrett"), were present in the home. Trooper Kelley placed $250 in prerecorded currency on the kitchen counter to purchase a quantity of pills. Before Piaquadio produced any pills, Garrett asked Trooper Kelley to snort a pill from the kitchen counter to prove he was not law enforcement. Trooper Kelley refused, and Piaquadio and Garrett disagreed as to whether to continue with the planned transaction. Piaquadio and Garrett stepped into another room to discuss the matter and then returned to the kitchen, at which point Piaquadio began calculating how many Oxycodone pills Trooper Kelley could purchase for $250.[2] Garrett continued to express concern that Trooper Kelley may be affiliated with law enforcement, prompting Piaquadio to request that Trooper Kelley snort a pill. Trooper Kelley again refused and left the residence without purchasing narcotics from Piaquadio.

Piaquadio filled prescriptions for 150 Oxycodone tablets and 10 Fentanyl patches on the morning of March 12, 2015. That afternoon, Joshua Cory Moroschok ("Moroschok") arrived at Piaquadio's home and used a bag of heroin provided by Piaquadio. Moroschok then went to the grocery store and ran an errand for

---

[2] The indictment alleged that Piaquadio attempted to sell 20 Oxycodone pills on November 26, 2014. The record is devoid of testimony or evidence confirming the precise quantity of pills Piaquadio was attempting to sell to Trooper Kelley.

Piaquadio in exchange for three Oxycodone pills.[3] When he returned with the groceries, Moroschok asked Piaquadio for a Fentanyl patch. Piaquadio agreed to provide a Fentanyl patch to Moroschok with the understanding that he would pay for it after receiving a paycheck the following day.[4]

Moroschok walked home that evening at approximately 7 p.m. with three Oxycodone pills and one Fentanyl patch. Around midnight, Moroschok used a portion of the Fentanyl patch to get high. We credit Moroschok's testimony that he cut the Fentanyl patch roughly into quarters, placed the quarter patch and some citrus acid on a spoon, and used heat to cook the narcotics out of the patch into the liquid. He used cotton and a syringe to draw up the liquid and inject it into his arm. Moroschok then lost consciousness.

Moroschok's mother, Earlene Margaret Shaw ("Shaw"), discovered her son shortly after midnight on March 13, 2015, slumped over on his bedroom floor, unconscious, and having difficulty breathing. Shaw observed a metal spoon on the

---

[3] Moroschok recalled Klonopin pills being passed around at Piaquadio's home on March 12. Moroschok testified that he may have ingested a Klonopin pill at Piaquadio's residence or on the way to the grocery store, but he could not remember for certain whether he took one.

[4] During his post-arrest interview, Piaquadio told law enforcement that Moroschok stole the particular Fentanyl patch that he overdosed on. However, we find Moroschok's testimony of events to be credible and corroborated by other witness testimony at trial. Katelyn testified that Piaquadio was often willing to provide drugs to individuals who could not pay. Katelyn, Sherri Lynn Leach ("Leach"), and Proctor each recalled receiving pills or patches from Piaquadio for free, and Leach and Proctor both testified that they often traded or ran errands in exchange for drugs. Piaquadio acknowledged in his post-arrest interview that Moroschok frequently claimed to have insufficient funds to cover the cost of the drugs.

4

floor and a needle in her son's arm. When Shaw rolled Moroschok over to try to improve his breathing, the needle stayed in his arm. Shaw called 911 for a medical emergency, and Galeton Borough's chief of police, Christopher J. Brackman ("Chief Brackman"), responded to the scene. Upon entering the room, Chief Brackman administered a sternum rub which failed to elicit a verbal response from Moroschok. Chief Brackman noticed a spoon with a substance on it, a burning candle on a stand next to the television, and a needle stuck in the right arm sleeve of Moroschok's shirt.[5] When the ambulance crew arrived, emergency medical technician Douglas Parsell ("Parsell") observed that Moroschok had a pulse, was breathing shallowly, and was unresponsive.

Moroschok was moved from the bedroom to the ambulance on a back board. In the ambulance, Parsell recorded Moroschok's blood oxygen saturation at 75% using pulse oximetry and described Moroschok's condition as "life threatening." Parsell gave Moroschok six liters of oxygen to increase the oxygen saturation in his blood, as well as a sternum rub which successfully restored Moroschok to a level of consciousness. Paramedic Donald James DuVall, Jr. ("DuVall"), boarded the ambulance on route to the hospital to provide advanced life support. DuVall

---

[5] Chief Brackman also found in Moroschok's bedroom a pill bottle for hydrocodone dated June 10, 2010, and prescribed to Ashlie Dean ("Dean"). The government objected to any testimony by Dean that Moroschok stole the pill bottle from her as inadmissible character evidence under Federal Rule of Evidence 404(b). We permitted Dean's testimony and reserved ruling on the government's objection until after trial. Because Dean's testimony is neither relevant to nor probative of the charges against Piaquadio—she did not recall receiving a prescription for hydrocodone, giving the pill bottle to Moroschok, or whether she consumed all of the pills prescribed in 2010, and she denied participating in drug distribution or use at Piaquadio's home—we will overrule the government's objection as moot.

5

recorded Moroschok's blood saturation at 83% and noted that Moroschok's speech was slurred and that he was confused. Moroschok admitted to using Fentanyl, and DuVall administered one milligram of Naloxone to improve Moroschok's respiratory effort. The Naloxone caused Moroschok to vomit, improved his blood oxygen saturation to 97%, and further enhanced his level of consciousness.

Emergency medical physician Perry Doan, D.O. ("Dr. Doan"), treated Moroschok upon his arrival at the hospital. Moroschok presented with an oxygen saturation level of 98%. He disclosed to emergency room personnel that he used heroin and Fentanyl by needle in the last 24 hours. A preliminary urinalysis screen at the hospital revealed the suspected presence of opiates and cannabis in Moroschok's system. Laboratory testing later confirmed the presence of cannabinoid, morphine, Oxycodone, and Oxymorphone.[6]

Three Oxycodone tablets and a partial Fentanyl patch were found on Moroschok's person at the hospital and turned over to law enforcement. Chief Brackman submitted various items to a laboratory for testing, including the spoon from Moroschok's bedroom as well as the three tablets and the partial patch recovered from Moroschok at the hospital. The laboratory determined that the residue on the spoon and the patch tested positive for Fentanyl and the three tablets tested positive for Oxycodone.

---

[6] The laboratory testing results established that no benzodiazepines were present in Moroschok's system. Klonopin is a benzodiazepine. The hospital did not direct the laboratory to test for Fentanyl.

6

Law enforcement arrested and interviewed Piaquadio on April 28, 2015. Piaquadio admitted that he and Flynn sold Oxycodone tablets and Fentanyl patches obtained by filling their respective prescriptions. During the last two years of the conspiracy alone, Piaquadio and Flynn received more than 8,000 Oxycodone tablets and 390 Fentanyl patches by filling prescriptions at area pharmacies. Piaquadio further admitted that he and Flynn sold between 100 to 120 Oxycodone tablets and one or two Fentanyl patches per month.

**B.    Medical Opinions**

Defense expert Robert M. Julien, M.D., Ph.D. ("Dr. Julien"), issued a report analyzing the events of March 13, 2015. Dr. Julien concluded that Moroschok was not in danger of imminent death from a Fentanyl overdose. Dr. Julien supported his conclusion by noting that laboratory testing revealed the presence of morphine (from heroin) and Oxycodone in Moroschok's urine but not Fentanyl; Dr. Julien conceded, however, that this was because no Fentanyl testing was performed. Dr. Julien observed that overdose victims typically relapse into an unconscious state, or "renarcotize," after the first dose of Naloxone wears off. He opined that the fact that Moroschok did not renarcotize is consistent with a nonfatal dose. In his expert report, Dr. Julien explained that an intravenous dose of Fentanyl causes a peak respiratory depressant effect in the first 5 to 15 minutes after injection and noted that Moroschok was likely past the peak risk period for an overdose death by the time emergency responders arrived 20 minutes after Shaw called 911.

Dr. Doan offered a competing view of Moroschok's pre-hospital condition. Dr. Doan testified that an oxygen saturation level below 88% is cause for "marked

concern" because cell death will begin at declined oxygen levels. He also testified that a declined oxygen saturation level is typically indicative of an airway blockage or a disease or other substance depressing the central nervous system. And Dr. Doan explained that Naloxone reengages a patient's normal respiratory pattern by preventing the body's opioid receptors from accepting any opiate drugs previously consumed. After noting that a transdermal Fentanyl patch releases 100 micrograms per hour for 72 hours (7,200 micrograms per patch), Dr. Doan testified that the effects of a 100-microgram dose of Fentanyl can be grave. Dr. Doan concluded by stating that, under the circumstances, Moroschok was likely to have sustained a mortal injury in the form of brain death or physical death without emergency medical treatment.

Dr. Doan's opinion is corroborated by eyewitness testimony and physical evidence. Moroschok used one quarter of a Fentanyl patch on the evening of March 12, 2015, which contained approximately 1,800 micrograms of Fentanyl. The dosage of Fentanyl that Moroschok injected rendered him unconscious, decreased his oxygen saturation level, and caused shallow breathing. Dr. Julien acknowledged that an individual with a blood oxygen saturation level of 75% (the level at which Moroschok initially presented) could die, although he opined that such a saturation level is survivable and that the outcome is impossible to state with any degree of certainty. And Dr. Julien recognized that if an addict successfully injected all of the Fentanyl contained in one quarter of a Fentanyl patch, the potential of such a dosage being fatal is high. For these reasons, we find persuasive Dr. Doan's opinion that Moroschok was in grave danger of sustaining a mortal injury.

## II. Conclusions of Law

The indictment charges Piaquadio with conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 (Count One); two counts of possession with intent to distribute and distribution of controlled substances on October 1, 2014 (Count Two) and March 12, 2015 (Count Four); and one count of possession with intent to distribute and attempt to distribute a controlled substance on November 26, 2014 (Count Three). In Counts One and Four, the indictment alleges that serious bodily injury resulted from use of the controlled substances distributed by Piaquadio. We will address each count in turn.

### A. Conspiracy

To sustain a conspiracy conviction under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt the following three elements: "(1) a shared unity of purpose, (2) an intent to achieve a common illegal goal, and (3) an agreement to work toward that goal, which [the defendant] knowingly joined." United States v. Claxton, 685 F.3d 300, 305 (3d Cir. 2012) (alteration in original) (quoting United States v. Boria, 592 F.3d 476, 481 (3d Cir. 2010)). The second element requires the government to prove that the defendant had actual knowledge of or was willfully blind to the specific unlawful objective contemplated by the conspiracy. United States v. Caraballo-Rodriguez, 726 F.3d 418, 425 (3d Cir. 2013) (*en banc*) (citations omitted). When the object of a conspiracy is the distribution of a controlled substance, the government must "introduce drug-related evidence, considered with the surrounding circumstances, from which a rational trier of fact

9

could logically infer that the defendant knew a controlled substance was involved in the transaction at issue." Boria, 592 F.3d at 481.

The evidence introduced at trial clearly establishes that Piaquadio and Flynn used physician prescriptions to obtain Oxycodone tablets and Fentanyl patches which they sold and at times distributed free of charge. Piaquadio and his coconspirators then utilized the proceeds from these unlawful transactions to purchase and distribute heroin. Piaquadio knew that he was distributing controlled substances, and he was admonished by his primary care physician not to sell or otherwise distribute his prescription medication. The government has proven beyond a reasonable doubt that Piaquadio knowingly and intentionally conspired with Flynn and others to distribute Oxycodone, Fentanyl, and heroin. And for the reasons discussed in subsection C.2 *infra*, the government has also proven beyond a reasonable doubt that serious bodily injury resulted from the use of these controlled substances, specifically Fentanyl.

**B.     Possession with Intent to Distribute and Distribution**

To convict a defendant of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1), the government must prove beyond a reasonable doubt that the defendant "(1) knowingly possessed a controlled substance with (2) the intent to distribute it." United States v. Iglesias, 535 F.3d 150, 156 (3d Cir. 2008) (quoting United States v. Bobb, 471 F.3d 491, 497 (3d Cir. 2006)). Possession may be actual or constructive and proven by direct or circumstantial evidence. Id. (citing Bobb, 471 F.3d at 497). A defendant constructively possesses a controlled substance if he or she "ha[s] the power and intent to exercise both

dominion and control over the object he or she is charged with possessing." Id. (quoting United States v. Garth, 188 F.3d 99, 112 (3d Cir. 1999)).

It is also unlawful for an individual to knowingly or intentionally distribute a controlled substance. 21 U.S.C. § 841(a)(1). To sustain a conviction for distribution of Oxycodone or Fentanyl, the government must prove that (1) the defendant "distributed a mixture or substance containing a controlled substance," (2) the defendant "distributed the controlled substance knowingly or intentionally," and (3) the controlled substance was Oxycodone or Fentanyl. United States v. Little, 314 F. Supp. 3d 647, 660 (E.D. Pa. 2018) (citing 21 U.S.C. §§ 841(a)(1), (b)(1)(C); THIRD CIRCUIT MODEL CRIMINAL JURY INSTRUCTION § 6.21.841B). To "'distribute' means to deliver (other than by administering or dispensing) a controlled substance or a listed chemical." 21 U.S.C. § 802(11); United States v. Rowe, 919 F.3d 752, 759 (3d Cir. 2019). Section 802 defines "deliver" and "delivery" as "the actual, constructive, or attempted transfer of a controlled substance or a listed chemical." 21 U.S.C. § 802(8); Rowe, 919 F.3d at 759.

1. *Counts Two and Three*

On October 1, 2014, Piaquadio filled prescriptions for Oxycodone and Fentanyl and then sold ten Oxycodone pills and two Fentanyl patches to Trooper Kelley in the pharmacy parking lot. The government has proven beyond a reasonable doubt that Piaquadio knowingly possessed ten Oxycodone pills and two Fentanyl patches with the intent to distribute same and transferred those pills and patches knowingly and intentionally to Trooper Kelley. On November 26, 2014, Piaquadio knowingly possessed Oxycodone pills and intended to distribute an

11

unknown quantity of said pills to Trooper Kelley in exchange for $250. Piaquadio knowingly and intentionally attempted to transfer Oxycodone pills to Trooper Kelley, but the transaction was prematurely terminated by Garrett out of fear that Trooper Kelley may be associated with law enforcement. The government has proven beyond a reasonable doubt that Piaquadio knowingly possessed an unknown quantity of Oxycodone pills with the intent to distribute same and attempted to transfer those Oxycodone pills knowingly and intentionally to Trooper Kelley.

### 2. *Count Four*

On March 12, 2015, Piaquadio obtained Oxycodone pills and Fentanyl patches from a local pharmacy. Piaquadio provided three Oxycodone pills to Moroschok in exchange for running an errand and picking up groceries and then gave Moroschok one Fentanyl patch with the expectation that Moroschok would reimburse Piaquadio after receiving his next paycheck. The government has proven beyond a reasonable doubt that Piaquadio knowingly possessed with intent to distribute three Oxycodone pills and one Fentanyl patch and transferred those pills and the patch knowingly and intentionally to Moroschok.

An individual convicted of a controlled substance offense may be subject to enhanced penalties "if death or serious bodily injury results from the use of such substance," 21 U.S.C. § 841(b)(1)(C), and the trier of fact specifically finds beyond a reasonable doubt that death or serious bodily injury did occur, see Burrage v. United States, 571 U.S. 204, 210 (2014). An individual suffers a "serious bodily injury" if the injury involves "substantial risk of death; [] protracted and obvious

disfigurement; or [] protracted loss or impairment of the function of a bodily member, organ, or mental faculty." 21 U.S.C. § 802(25)(A)-(C). The Third Circuit Court of Appeals has not considered whether a victim who suffers and survives an overdose from use of a controlled substance can be said to have suffered serious bodily injury. The Eighth Circuit Court of Appeals has addressed this question in two recent published opinions. See United States v. Seals, 915 F.3d 1203 (8th Cir. 2019); United States v. Lewis, 895 F.3d 1004 (8th Cir. 2018).

The court's decision in Lewis is particularly instructive. In that case, two individuals became unresponsive from using heroin purchased from the defendant. Lewis, 895 F.3d at 1006. Emergency responders administered Narcan (Naloxone) and revived the two individuals. Id. Evidence presented at trial indicated that these individuals were unconscious because of an opiate overdose and that at least one was at serious risk of death without medical intervention. Id. at 1007. The panel determined that an overdose posing a serious risk of death without medical intervention was sufficient to constitute serious bodily injury under Section 841(b)(1)(C). See id. at 1010. This result is logical and consistent with the statutory definition of "serious bodily injury." See 21 U.S.C. § 802(25)(A). We predict that the Third Circuit would similarly conclude that an overdose posing a serious risk of death without medical intervention constitutes serious bodily injury.

The evidence adduced at trial establishes that around midnight on March 12, 2015, Moroschok injected a solution containing Fentanyl from a quarter of a Fentanyl patch causing him to overdose. Shaw and Chief Brackman testified credibly that the Fentanyl injection rendered Moroschok unconscious and induced

13

labored or shallow breathing. Emergency personnel administered pulse oximetry which revealed a significant decrease in his blood oxygen saturation; Moroschok's blood oxygen level was initially 75%, which is a full 13% below a level (88%) that Dr. Doan testified was cause for "marked concern," and a level that Dr. Julien conceded *could* lead to death. Moroschok required multiple sternum rubs, oxygen, and a dose of Naloxone to regain full consciousness and to restore his blood oxygen saturation to normal levels. Dr. Doan testified that Moroschok was likely to have sustained a mortal injury without emergency medical treatment. Even defense expert Dr. Julien acknowledged that injecting a full dose of Fentanyl from one quarter of a Fentanyl patch presents a high risk of fatality. The government has proven beyond a reasonable doubt that Moroschok suffered serious bodily injury in the form of a drug overdose that placed him at serious risk of brain death or physical death without medical intervention.

To obtain a conviction under Section 841(b)(1)(C)'s "death or serious bodily injury results" penalty enhancement, the government must also prove that the defendant's "conduct is 'both (1) the actual cause, and (2) the 'legal' cause (often called the 'proximate cause') of the result.'"[7] United States v. Gonzalez, 905 F.3d 165, 189 (3d Cir. 2018) (quoting Burrage, 571 U.S. at 210). Actual cause requires proof "'that the harm would not have occurred' in the absence of—that is, but for—

---

[7] The Supreme Court suggested in *dicta* that, under certain circumstances, use of a controlled substance may be said to result in serious bodily injury or death if it was an "independently sufficient cause" of the injury or death. See Burrage, 571 U.S. at 214-15. Because we conclude *infra* that the government has proven that the Fentanyl was both the actual and proximate cause of Moroschok's serious bodily injury, we need not address this issue.

14

the defendant's conduct." Id. (quoting Burrage, 571 U.S. at 211). Proximate cause necessitates a finding that the serious bodily injury or death was a reasonably foreseeable result of the offense conduct. See id. at 189-90 (citing Paroline v. United States, 572 U.S. 434, 444-45 (2014)). "[P]roximate cause forecloses liability in situations where the causal link between conduct and result is so attenuated that the so-called consequence is more akin to mere fortuity." Id. at 189 (quoting Paroline, 572 U.S. at 446, 448). In Paroline, the Supreme Court opined that "to say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result." Id. (quoting Paroline, 572 U.S. at 444).

Moroschok used heroin on March 12, 2015, and he was able to go to the grocery store and run an errand; return to Piaquadio's residence and convince Piaquadio to provide him a Fentanyl patch on credit; and then walk home. Several hours elapsed between Moroschok's use of heroin and his injection of Fentanyl. Laboratory testing revealed the presence of Oxycodone in Moroschok's system, but the three pills he received from Piaquadio that day were found on Moroschok's person at the hospital. To the extent Moroschok took Oxycodone on March 12, he ingested that drug prior to using the Fentanyl obtained from Piaquadio. Moroschok was discovered unconscious with a syringe stuck in his right arm and shirt sleeve and in close proximity to a metal spoon containing Fentanyl residue and a burning candle. After he regained consciousness, Moroschok consistently admitted, to each individual who provided him with medical care, that he had recently used Fentanyl. The evidence establishes that Moroschok would not have overdosed shortly after

15

midnight on March 13, 2015, but for his decision to use Fentanyl which was provided to him by Piaquadio several hours prior. The government has proven beyond a reasonable doubt that Moroschok's use of a Fentanyl patch that he received from Piaquadio was the actual cause and the legal cause of his serious bodily injury.

### III. Conclusion

Upon consideration of the evidence introduced at trial, the court finds that the government has proven beyond a reasonable doubt that Piaquadio committed the crimes charged in Counts One through Four of the indictment, to wit: one count of conspiracy to distribute a controlled substance (heroin, Oxycodone, and Fentanyl) in violation of 21 U.S.C. § 846, and three counts of possession with intent to distribute and distribution of a controlled substance (Oxycodone or Fentanyl) on October 1, 2014, November 26, 2014, and March 12, 2015, all in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The court also finds that the government has proven beyond a reasonable doubt that the use of a controlled substance (Fentanyl) distributed by Piaquadio, as charged in Counts One and Four, resulted in serious bodily injury to another. An appropriate order shall issue.

        /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:     July 25, 2019