# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL NO. 4:15-CR-249 |
| v. | : (Chief Judge Conner) |
| DAVID PIAQUADIO, | : |
| Defendant | : |

## MEMORANDUM

David Piaquadio was found guilty of four controlled-substance offenses following a bench trial in July 2019. Piaquadio now moves for judgment of acquittal under Federal Rule of Criminal Procedure 29 and for a new trial under Federal Rule of Criminal Procedure 33. (Docs. 98, 99). The government opposes both motions. (Doc. 122). We will deny Piaquadio's motions.

I.  **Factual Background & Procedural History**

In October 2015, a federal grand jury returned a four-count indictment charging Piaquadio with conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 and possession with intent to distribute and distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1). (See Doc. 1). Count One charged that from January 2011 through April 28, 2015, Piaquadio conspired to distribute Oxycodone tablets, Fentanyl patches, and heroin, and that serious bodily injury resulted from the use of those controlled substances. Count Two charged that Piaquadio possessed with intent to distribute and did distribute ten Oxycodone tablets and two Fentanyl patches on October 1, 2014. Count Three charged that Piaquadio possessed with

intent to distribute and attempted to distribute 20 Oxycodone tablets on November 26, 2014. And Count 4 charged that, on March 12, 2015, Piaquadio possessed with intent to distribute and did distribute Oxycodone and Fentanyl and that serious bodily injury resulted from use of those controlled substances.

On July 1 and July 2, 2019, the court held a bench trial. We found Piaquadio guilty of all counts and issued a July 25, 2019 memorandum containing our findings of fact and conclusions of law. (See Doc. 95). We presume familiarity with our memorandum, but will briefly outline several findings uniquely relevant here:

- On the afternoon of March 12, 2015, Joshua Moroschok arrived at Piaquadio's house and used a bag of heroin provided by Piaquadio. (Id. at 3-4). Moroschok then ran an errand on Piaquadio's behalf in exchange for three Oxycodone pills. (Id.) When Moroschok returned to Piaquadio's house, Piaquadio gave him a Fentanyl patch with the understanding that he would pay for it the next day. (Id. at 4).

- Moroschok walked home at approximately 7 p.m. with three Oxycodone pills and one Fentanyl patch. (Id.) Around midnight, he used a portion of the Fentanyl patch to get high. (Id.) Moroschok testified credibly that he cut the Fentanyl patch roughly into quarters, placed the quarter patch and some citrus acid on a spoon, and used heat to cook the narcotics out of the patch and into the liquid before using cotton and a syringe to draw up the liquid and inject it into his arm. (Id.) Moroschok then lost consciousness. (Id.)

- Shortly thereafter, Moroschok's mother found her son unconscious in his room and called 911. (Id. at 4-5). At the scene, police identified a spoon with a substance on it, a burning candle, and a needle stuck in Moroschok's right arm. (Id. at 5). The spoon found in Moroschok's room tested positive for Fentanyl. (Id. at 6).

- After regaining consciousness, Moroschok admitted to using Fentanyl to emergency response personnel and hospital staff. (Id. at 5-7). He also admitted to using heroin in the 24 hours before his overdose, and medical tests confirmed the presence of cannabinoid, morphine, Oxycodone, and Oxymorphone in his system. (Id. at 6). Moroschok used roughly one quarter of an 1,800 microgram Fentanyl patch. (Id. at 8).
Dr. Doan treated Moroschok at the hospital and opined that such a dose of

2

> Fentanyl could be fatal absent medical treatment. (Id. at 7-8). His opinion was corroborated by testimony and physical evidence. (Id. at 8).

- When Moroschok arrived at the hospital, staff found three Oxycodone tablets and a partial Fentanyl patch on his person and gave them to law enforcement. (Id. at 6).

Piaquadio now moves for judgment of acquittal and for a new trial as to the convictions on Counts One and Four. His motion for new trial is based, in part, on newly discovered evidence. Before trial, on June 13, 2019, the court granted Piaquadio's *ex parte* motion for a subpoena *duces tecum* seeking records related to Moroschok's incarcerations in Potter County Jail. (See Docs. 67, 71). After trial, on July 19, 2019, the jail faxed the requested records to the Federal Public Defender's office. (See Doc. 99-4). One of the records was an affidavit in support of a petition for capias from a Pennsylvania Court of Common Pleas judge. (See Doc. 99-5). In that affidavit, Potter County Probation Officer Derek Morley stated that he met with Moroschok at the Galeton Police Department on March 14, 2015, and, when asked about his March 12, 2015 overdose, Moroschok "admitted to snorting two pills and injecting the other part of the Fentanyl patch." (Id. at 2).

## II. Legal Standard

### A. Rule 29 Judgment of Acquittal

On motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, the court must decide whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" based on the evidence presented at trial. United States v. Caraballo-Rodriguez, 726 F.3d 418, 431 (3d Cir. 2013) (*en banc*) (quoting Jackson v. Virginia, 443 U.S. 307, 319

3

(1979)); see also United States v. Freeman, 763 F.3d 322, 343 (3d Cir. 2014). The court must view the evidence in a light most favorable to the prosecution and must deny the motion "if there is substantial evidence . . . to uphold the jury's decision." Caraballo-Rodriguez, 726 F.3d at 430 (quoting United States v. Gambone, 314 F.3d 163, 170 (3d Cir. 2003)). Under this highly deferential standard of review, it is not the court's task to "act as the thirteenth juror," weigh credibility, assign weight to evidence, or "substitute [its] judgment for that of the jury." Id. (citations omitted). The decision to overturn a conviction based on insufficient evidence may only be made "where the prosecution's failure is clear," United States v. Leon, 739 F.2d 885, 890 (3d Cir. 1984) (quoting Burks v. United States, 437 U.S. 1, 17 (1978)), or where the verdict "fall[s] below the threshold of bare rationality," Caraballo-Rodriguez, 726 F.3d at 431. The same test applies to both jury and nonjury trials. See United States v. Doody, 600 F.3d 752, 754 (7th Cir. 2010) (citation omitted); United States v. Magallon-Jimenez, 219 F.3d 1109, 1112 (9th Cir. 2000) (citation omitted).

**B.  Rule 33 New Trial**

Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). Granting or denying a motion for a new trial "lies within the discretion of the district court." United States v. Cimera, 459 F.3d 452, 458 (3d Cir. 2006). A court evaluating a Rule 33 motion does not view the evidence in a light favorable to the government but instead must "exercise[] its own judgment in assessing the Government's case." United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002) (citation omitted). Rule 33 motions are disfavored and should be "granted sparingly

4

and only in exceptional cases." United States v. Silveus, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting Gov't of V.I. v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987)). Exceptional cases include those in which trial errors "so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993) (citation omitted). District courts can thus order a new trial on the theory that the verdict is contrary to the weight of the evidence only if "there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." United States v. Salahuddin, 765 F.3d 329, 346 (3d Cir. 2014) (quoting United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002)).

**III. Discussion**

**A. Judgment of Acquittal**

Piaquadio claims that his convictions on Counts One and Four are not supported by sufficient evidence and that the court erred both in its findings of fact and conclusions of law. He asserts that we incorrectly credited Moroschok's testimony and discredited expert testimony and laboratory reports in concluding that Moroschok's use of Fentanyl was a but-for cause of his overdose. For all of the reasons offered in our July 25, 2019 memorandum, we disagree and conclude that a rational trier of fact could have found Piaquadio guilty of the charged offenses.

As to Count One, evidence introduced at trial established that Piaquadio was knowingly engaged in a joint endeavor to obtain Oxycodone tablets and Fentanyl patches, sell those controlled substances, and use the proceeds to finance a heroin distribution enterprise. (Doc. 95 at 10). As to Count Four, ample evidence

5

supported our conclusion that Piaquadio knowingly possessed with the intent to distribute three Oxycodone pills and one Fentanyl patch, and intentionally transferred those drugs to Moroschok. (Id. at 12). Evidence supporting these conclusions includes, but is not limited to: police testimony; medical opinions; a confidential informant; and Moroschok's testimony. (See generally id.)

Both counts also required proof that the charged conduct "result[ed]" in "death or serious bodily injury" to Moroschok. 21 U.S.C. § 841(b)(1)(C). This element tasked the court to address the threshold legal question of whether a victim who suffers and survives an overdose can be said to have suffered serious bodily injury. The Third Circuit has not considered whether an overdose and loss of consciousness constitutes serious bodily injury under Section 841. In our memorandum accompanying Piaquadio's conviction, we consulted out-of-circuit precedents to define that phrase. Drawing on the Eighth Circuit's analysis in United States v. Seals, 915 F.3d 1203 (8th Cir. 2019), and United States v. Lewis, 895 F.3d 1004 (8th Cir. 2018), we predicted that the Third Circuit would find that "an overdose posing a serious risk of death without medical intervention constitutes serious bodily injury." (Doc. 95 at 13). We therefore held that Moroschok's overdose and resulting loss of consciousness requiring medical attention was a serious bodily injury. (Id. at 13-14). The Fifth Circuit also recently held that ingestion of a controlled substance and subsequent loss of consciousness requiring medical attention amounts to serious bodily injury. See United States v. Thompson, 945 F.3d 340, 343, 345 (5th Cir. 2019). We now reaffirm this standard.

Substantial testimony and evidence then supported our conclusion that Piaquadio's unlawful conduct resulted in Moroschok's serious bodily injury. (Doc. 95 at 13-14). The court's bench verdict identifies evidence proving that Piaquadio's conduct was both the actual and proximate cause of Moroschok's serious bodily injury. (Id. at 14-16). We specifically cited: evidence of the time elapsed between Moroschok's heroin use and later Fentanyl use, and the temporal proximity between Moroschok's Fentanyl use and overdose; the Oxycodone obtained from Piaquadio on his person; the Fentanyl found on the syringe, shirt sleeve, and metal spoon at the scene of Moroschok's overdose; and his consistent admissions to using Fentanyl before his overdose. (Id.)

Viewing the evidence in a light most favorable to the prosecution, there is substantial evidence supporting Piaquadio's convictions. Piaquadio has failed to show that no rational trier of fact could find him guilty. We will accordingly deny his motion for judgment of acquittal.

**B.  New Trial**

Piaquadio seeks a new trial as to Counts One and Four on two grounds. First, he claims his conviction was against the weight of the evidence, raising challenges to three specific findings. Second, he contends that newly discovered evidence undermines our conclusion that Moroschok's consumption of Fentanyl was a but-for cause of his serious bodily injury. We address each theory in turn.

1.  *Weight of the Evidence: Serious Bodily Injury*

Piaquadio first asserts that our finding that Moroschok suffered "serious bodily injury" is contrary to the weight of the evidence. As described above, we

predict that the Third Circuit would conclude that "serious bodily injury" encompasses "an overdose posing a serious risk of death without medical intervention." (See Doc. 95 at 13). That standard applies with full force at this procedural juncture.

Piaquadio argues that expert testimony suggests that Moroschok may have survived his overdose without medical intervention. (See Doc. 119 at 4-5). This isolated testimony—which is rebuffed by competing testimony and medical testing, (see Doc. 95 at 14-15)—does not upend our finding that Moroschok suffered serious bodily injury. Moroschok needed extensive treatment to regain consciousness and restore his blood oxygen saturation to normal levels. (Id.) And Moroschok's treating physician, Dr. Perry Doan, testified that Moroschok risked mortal injury from his ingestion of Fentanyl. (Id.) Overwhelming evidence thus supported our conclusion that Piaquadio suffered a serious bodily injury.

### 2. *Weight of the Evidence: But-For Causation*

Piaquadio raises several challenges to our finding that Moroschok's Fentanyl use was a but-for cause of his serious bodily injury. (Doc. 119 at 5-10). He claims that the evidence does not support our conclusion that Moroschok obtained heroin from Piaquadio at his house. Piaquadio further intimates that Moroschok obtained heroin from another source and used heroin between leaving Piaquadio's house around 7 p.m. and losing consciousness around midnight. Then he argues that the court's timeline of events—specifically the finding that Moroschok went directly home at 7 p.m.—conflicts with testimony that suggests Moroschok may have ingested heroin after leaving Piaquadio's house but before overdosing.

8

Piaquadio first asserts that our finding that Moroschok obtained heroin from him is against the weight of the evidence because some testimony indicates that Moroschok and other drug users purchased heroin from other sellers in Williamsport. (Id. at 5-8). Piaquadio's speculative argument that Moroschok may have purchased heroin from an alternative source depends not on hard evidence, but on third-party testimony from witnesses who claim *they* did not purchase heroin from Piaquadio. (See, e.g., 9/3/2019 Trial Tr. 130:24-131:1; id. at 139:5-140:2; id. at 152:24-25). The purchasing habits of others do not affect our finding that *Moroschok* obtained heroin from Piaquadio and used that heroin before leaving Piaquadio's house on March 12, 2015. That these other witnesses testified that they sometimes purchased heroin in Williamsport does not disprove that Moroschok received heroin from Piaquadio on the day at issue.

Piaquadio next argues that Moroschok's own testimony about his sources of heroin oppugns our finding that he obtained and used heroin at Piaquadio's home on March 12. Specifically, Piaquadio claims that Moroschok offered conflicting testimony when he said that he exclusively bought heroin from Piaquadio, but that he "might have" gone to Williamsport with Katelyn Piaquadio to buy heroin. (Doc. 119 at 6 (citing 9/3/2019 Trial Tr. 200:22-23, 204:1-2)). But Moroschok was not even asked whether he traveled to Williamsport to buy heroin with Katelyn Piaquadio. He was instead asked whether he ever bought heroin from Katelyn Piaquadio, to which he responded: "I don't – I might have." (9/3/2019 Trial Tr. 204:1-2). This vague and tentative answer is not enough to cast doubt on our evaluation of Moroschok's credibility. Piaquadio's reliance on Moroschok's testimony that he

traveled to Williamsport with Piaquadio to buy heroin "once or twice" fares no better. (Doc. 119 at 6 (citing 9/3/2019 Trial Tr. 190:19-21)). This statement at most proves that prior unidentified heroin purchases occurred in Williamsport. And neither statement disproves Moroschok's activities on March 12, 2015.

Next, Piaquadio argues that inconsistent testimony regarding Moroschok's whereabouts on March 12, 2015, undermines our finding that Moroschok walked home at 7:00 p.m. Piaquadio points to testimony from Moroschok's mother, Earlene Shaw, explaining that Moroschok arrived home around midnight on the night of March 12. That testimony is contradicted by Moroschok's testimony. As the finder of fact, the court weighed all testimony presented and found that Moroschok went home around 7 p.m. and ingested Fentanyl around midnight. (See Doc. 95 at 4). We credited Moroschok's testimony, (see id.), and we will not disturb our finding based solely on Shaw's testimony, which we considered in convicting Piaquadio.

Implicit in Piaquadio's argument is speculation that Moroschok ingested heroin (or another drug) between 7 p.m. and midnight on March 12, 2015. Piaquadio asks us to rely on the fact that Chief Brackman recovered a pill bottle and wax paper often used to package heroin. (Doc. 119 at 9). That Moroschok was found with remnants of heroin packaging is not surprising—he testified that he had purchased and in-fact used heroin earlier that day. Piaquadio did not cite testimony suggesting that Moroschok used heroin a second time during the period between 7 p.m. and midnight. In any event, we credited (and still do) Moroschok's testimony that he lost consciousness after injecting Fentanyl around midnight. (Doc. 95 at 4, 6). And the physical evidence obtained in his bedroom confirms that

10

he injected Fentanyl shortly before losing consciousness. (Id. at 6). That timeline is also consistent with statements he made to emergency response personnel after his overdose. (Id.) Unsubstantiated speculation about what Moroschok *may* have ingested between 7 p.m. and midnight pales in comparison to evidence proving he ingested Fentanyl before losing consciousness. Piaquadio's speculative theory is wholly insufficient to support a motion for new trial.

### 3. *Weight of the Evidence: Purchase of Fentanyl, Oxycodone, and Heroin*

Piaquadio lastly contends that the government failed to prove beyond a reasonable doubt that Piaquadio sold Moroschok a Fentanyl patch and provided him with both Oxycodone and heroin on March 12, 2015. Piaquadio first suggests that police inadequately investigated the purported exchange of Fentanyl between Piaquadio and Moroschok. Piaquadio initially told investigators that Moroschok stole the Fentanyl patch. (See Doc. 119 at 12-13). He claims police failed to question others who may have been witnesses at his home when Moroschok was present on March 12, 2015. (Id.) The police's failure to question Piaquadio or other potential witnesses about the exchange of Fentanyl does not undermine our finding—based on evidence at trial—that Moroschok obtained the Fentanyl patch from Piaquadio after running errands on his behalf. (Doc. 95 at 3-4).

Piaquadio then claims that testimony from defense witness Jon Proctor suggests that Moroschok stole the Fentanyl patch from Piaquadio. Yet Proctor was not present when Moroschok claims Piaquadio gave Moroschok the Oxycodone pills and Fentanyl patch. (See 9/4/2019 Trial Tr. 150:15-17). Proctor's testimony proves

nothing—it neither corroborates nor disproves Piaquadio's or Moroschok's narrative. Moroschok, on the other hand, testified that this transaction occurred on Piaquadio's front porch after Moroschok ran errands for Piaquadio. (9/3/2019 Trial Tr. 181:21-182:3). We, as the finder of fact, weighed this purportedly competing testimony and deemed Moroschok's worthy of reliance.

Notwithstanding Piaquadio's claims to the contrary, the weight of the evidence proves beyond a reasonable doubt that the Fentanyl Moroschok obtained from Piaquadio was the but-for cause of his "serious bodily injury." A new trial is thus not warranted on this basis.

### 4. *Newly Discovered Evidence*

Piaquadio also seeks a new trial on the theory that newly discovered evidence undermines his conviction. Specifically, Piaquadio asks the court to consider a statement from Potter County Probation Officer, Derek Morley, that on March 14, 2015, Moroschok "admitted to snorting two pills and injecting the other part of the Fentanyl patch." (Doc. 118 at 4 (quoting Doc. 99-5)). The proffered statement lacks any additional context as to when or where Moroschok's alleged drug use took place. (See Doc. 99-5). Piaquadio argues Officer Morley's statement compromises Moroschok's testimony and the court's finding that his ingestion of Fentanyl caused his serious bodily injury. We disagree.

To succeed on a motion for a new trial based on newly discovered evidence, the defendant must prove five elements:

> (a) [T]he evidence must be in fact newly discovered, *i.e.*[,] discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the

> movant; (c) the evidence relied on must not be merely
> cumulative or impeaching; (d) it must be material to the
> issues involved; and (e) it must be such, and of such
> nature, as that, on a new trial, the newly discovered
> evidence would probably produce an acquittal.

United States v. Schneider, 801 F.3d 186, 201-02 (3d Cir. 2015) (alteration in original) (quoting United States v. Quiles, 618 F.3d 383, 38889 (3d Cir. 2010)). There is no dispute that Officer Morley's statement was unavailable at trial and has since been discovered with due diligence. (See Doc. 118 at 3-5; Doc. 122 at 10-13). But Officer Morley's statement is immaterial, cumulative, and, at best, serves to impeach Moroschok's credibility.

Officer Morley's statement confirms that Moroschok used both Oxycodone and Fentanyl on the day of his overdose. It does not offer any new or materially different information from that communicated to emergency response personnel by Moroschok on the night of his overdose. Moroschok admitted to using Fentanyl to both paramedic and hospital personnel, and he testified to that effect at trial. (Doc. 95 at 6). A urinalysis screen at the hospital also tested positive for Oxycodone. (Id.) In light of Moroschok's statements, medical testing, and trial testimony, we found that he ingested Oxycodone before obtaining Fentanyl from Piaquadio and that the Fentanyl was the but-for cause of Moroschok's overdose. (Id. at 15; see also 9/3/2019 Trial Tr. 209:1-6). Officer Morley's statement does not disrupt our findings regarding Moroschok's credibility or the timing of his drug use. His statement is thus cumulative and immaterial.

Officer Morley's statement instead serves as impeachment evidence. Piaquadio argues that the statement "undermines Moroschok's credibility,"

13

(Doc. 118 at 4), and our finding of serious bodily injury because "this case rests almost entirely on the testimony of Moroschok," (Doc. 125 at 8). In other words, Piaquadio claims that Officer Morley's statement should encourage the court to discredit or discount Moroschok's in-court and out-of-court statements. Newly discovered evidence relevant only for impeachment does not make a successful claim for a new trial under Rule 33. See Schneider, 801 F.3d at 201-02 (quoting Quiles, 618 F.3d at 388-89). And, in any event, we remain unconvinced that Piaquadio's newly discovered evidence would produce an acquittal. Id. at 202 (quoting Quiles, 618 F.3d at 388-89). We will deny Piaquadio's motion for a new trial based on new evidence.

**IV.    Conclusion**

The court will deny Piaquadio's motions (Doc. 98, 99) for judgment of acquittal and new trial. An appropriate order shall issue.

        /S/ CHRISTOPHER C. CONNER
        Christopher C. Conner, Chief Judge
        United States District Court
        Middle District of Pennsylvania

Dated:    January 29, 2020