UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 4:15-CR-249 |
| | ) | |
| | ) | (CONNER, C.J.) |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| DAVID PIAQUADIO, | ) | |
| Defendant | ) | |

### MEMORANDUM FOR COVID-19 BAIL DECISION
*Defendant Piaquadio's Motion for Bail, Doc. 133*

I.   INTRODUCTION

Before the Court is Mr. Piaquadio's Motion for Presentence Release (Doc. 133). Along with the Motion, a Brief (Doc. 134), the required notice (Doc. 135) requesting a hearing, and the Government's Brief in Opposition (Doc. 136) were filed. For the reasons detailed in this Memorandum, the request for a hearing and release from detention will be denied.

II.   BACKGROUND & PROCEDURAL HISTORY

This case began with the indictment of Mr. Piaquadio. (Doc. 1) on October 22, 2015. Mr. Piaquadio had his Initial Appearance and Arraignment on October 27, 2015. (Doc. 6). I ordered Mr. Piaquadio remain detained pending trial. (Doc. 11). Mr. Piaquadio did not oppose detention at that time and reserved the right to seek bail at a later date. *Id.*

On October 28, 2015, Judge Conner issued a Scheduling Order (Doc. 12) which scheduled, among other things, jury selection and trial for December 7, 2015.

After Judge Conner granted nineteen (19) Motions to Continue (Docs. 22, 25, 27, 29, 31, 33, 35, 37, 39, 41, 43, 46, 49, 51, 53, 55, 57, 60, & 62), jury selection and trial were scheduled for July 1, 2019.

On July 25, 2019, after a bench trial, Mr. Piaquadio was found guilty on all four counts from the indictment. (Doc. 96).

On August 8, 2019, Mr. Piaquadio filed a singular Motion seeking Judgment of Acquittal and a New Trial (Doc. 98), a Motion for New Trial Pursuant to Rule 33 (Doc. 99), and a Motion for Extension of Time to File Briefs in Support of Post-Trial Motions (Doc. 100). On August 12, 2019, Judge Conner granted Mr. Piaquadio's Motion for Extension of Time to File Briefs in Support of Post-Trial Motions. (Doc. 101). Following three more Motions for Extension of Time to File Briefs in Support of Post-Trial Motions (Docs. 104, 109, 112), Mr. Piaquadio filed Briefs in Support of his post-trial motions on November 8, 2019. (Docs. 117, 118, 119). On December 6, 2019, the Government filed one Brief in Opposition to Mr. Piaquadio's post-trial motions. (Doc. 122). On December 23, 2019, Mr. Piaquadio filed a Reply Brief. (Doc. 125).

At this time, Mr. Piaquadio has not been sentenced.[1]

On April 15, 2020, Mr. Piaquadio filed a Motion for Presentence Release (Doc. 133) and a Brief in Support (Doc. 134). That same day, I issued an Order instructing the parties to confer by telephone to determine if a joint resolution could be reached. On April 17, 2020, Mr. Piaquadio filed Notice (Doc. 135) that a joint resolution could not be reached regarding his continued detention. On April 20, 2020, the Government filed its Brief in Opposition (Doc. 136).

## III.   COURT PROCEDURE FOR COVID-19 CASES

Anticipating a significant number of requests for reconsideration of bail in light of the COVID-19 pandemic, the Court instituted an expedited procedure to hear these cases in an orderly and deliberate fashion. The filing of a bail motion citing COVID-19 as a reason for release from detention will be specifically designated and a docket entry will automatically notify counsel about the expedited procedures. That entry was made in this case on April 15, 2020.

## IV.   STANDARD OF REVIEW

After a bench trial, Mr. Piaquadio was found guilty on all counts from the indictment. Thus, Mr. Piaquadio is no longer a pretrial detainee, as he is awaiting

---

[1] Mr. Piaquadio's sentencing is scheduled for May 21, 2020.

sentencing. Mr. Piaquadio's continued detention is to be analyzed under 18 U.S.C.

§ 3143, which provides:

(a) Release or Detention Pending Sentence.—

(1) Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, other than a person for whom the applicable guideline promulgated pursuant to 28 U.S.C. 994 does not recommend a term of imprisonment, be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c). If the judicial officer makes such a finding, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c).

(2) The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (c) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained unless—

(A)
(i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or
(ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and
(B) The judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

An individual detained under Section 3143 may challenge their detention
under 18 U.S.C. § 3145(c), which provides in relevant part:

> A person subject to detention pursuant to section 3143(a)(2) or (b)(2),
> and who meets the conditions of release set forth in section 3143(a)(1)
> or (b)(1), may be ordered released, under appropriate conditions, by the
> judicial officer, if it is clearly shown that there are exceptional reasons
> why such person's detention would not be appropriate.

18 U.S.C. § 3145(c).

## V.   REVIEW OF PREVIOUS BAIL DECISION

The original Order of Detention was filed on October 27, 2015. (Doc. 11). At
the hearing, Mr. Piaquadio did not oppose detention but did reserve his right to seek
bail in the future. *Id.*

## VI.   DISCUSSION OF THE COVID-19 PANDEMIC

We are mindful of the unprecedented magnitude of the COVID-19 pandemic
and the extremely serious health risks it presents.[2] We are also cognizant that the
President of the United States has declared a national emergency and that the
Governor of the Commonwealth of Pennsylvania[3] has also declared a state of

---

[2] World Health Organization, "WHO characterized COVID-19 as a
pandemic" March 25, 2020, available at
https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen

[3] Governor Thomas Wolf proclaimed the existence of a disaster emergency
throughout the Commonwealth pursuant to 35 Pa.C.S. §7301(c) on March 6, 2020.
He ordered all non-essential business in the Commonwealth to close on March 20,
2020, and he extended the closure of non-essential businesses and schools

emergency to address the needs of the nation and the Commonwealth respectively. We also recognize that public health officials have strenuously encouraged the public to practice "social distancing," to hand-wash and/or sanitize frequently, and to avoid close contact with others—all of which presents challenges in detention facilities. *See United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857 *2 (D. Md. Mar. 17, 2020). As of April 4, 2020, 24 cases have been issued around the country citing *Martin*. Of the 24 cases that cite *United States v. Martin,* only three cases released the detainee, 20 cases detained the defendant, and one case granted bail review. In *United States v. Davis*, the judge denied the government motion for pretrial detention because the detention facility already had cases of COVID-19 and the individual was not a flight risk and posed no serious threat to the community. *United States v. Davis*, No. ELH-20-09, 2020 WL 1529158 (D.Md. Mar. 30, 2020). The case also relied heavily on expert opinion that pretrial facilities are poorly equipped to manage the highly contagious and potentially deadly coronavirus. *Id.*

---

"indefinitely" to slow the progression of the pandemic. "Gov. Wolf and Sec. of Health Expand 'Stay at Home' Order to Carbon, Cumberland, Dauphin and Schuylkill Counties, Extend School Closures Indefinitely," March 30, 2020, available at https://www.governor.pa.gov/newsroom/gov-wolf-and-sec-of-health-expand-stay-at-home-order-to-carbon-cumberland-dauphin-and-schuylkill-counties-extend-school-closures-indefinitely/.  That Stay at Home Order was extended to all 67 counties on April 2, 2020 to be effective thru April 30, 2020. https://www.pa.gov/guides/responding-to-covid-19/#StayatHomeOrder (last accessed April 4, 2020).

Two out of the three cases were people detained due to immigration proceedings. See *Basank v. Decker*, No. 20-cv-2518 AT, 2020 WL 1481503, (S.D.N.Y. Mar. 26, 2020) and *Coronel, et al. v. Decker, et al.*, No. 20-cv-2472 AJN, 2020 WL 1487274 (S.D. N.Y. Mar. 27, 2020). Additionally, there was one case that only granted review of bail hearings to be assessed on a case to case basis. See *Karr v. State*, No. 4FA-19-00872CR, 2020 WL 1456469 (Alaska Ct. App. Mar. 24, 2020).

In a precedential opinion analyzing a COVID-19 release request in the context of the compassionate release provisions of the First Step Act the Third Circuit concluded that COVID-19 risk alone does not require release where the prison system has a plan in place to deal with the pandemic.

> We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread. *See generally* Federal Bureau of Prisons, *COVID-19 Action Plan* (Mar. 13, 2020, 3:09 PM), https://www.bop.gov/resources/news/20200313_covid-19.jsp. Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance. And given the Attorney General's directive that BOP "prioritize the use of [its] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic," we anticipate that the exhaustion requirement will be speedily dispatched in cases like this one. Memorandum from Attorney Gen. to Dir.,    Bureau    of    Prisons    1    (Mar.    26,    2020),

https://www.justice.gov/file/1262731/download. So we will deny Raia's motion.

*U.S. v. Raia,* 20-1033, slip op. at 8 (3d Cir. April 2, 2020)

On March 31, 2020, Judge Jones of this Court ordered the immediate release of fourteen men and women held in ICE civil detention in Pike, Clinton and York County facilities. According to Judge Jones, "Each of the petitioners suffers from chronic medical conditions and faces an imminent risk of death or serious injury if exposed to Covid-19." *Thakker v. Doll*, 1:20-cv-0480, slip op. at 2 (M.D. Pa. March 31, 2020. Ruling on their habeas "conditions of confinement" petitions[4] he found that "…a remedy for unsafe conditions need not await a tragic event." *Thakker v. Doll*, 1:20-cv-0480, slip op. at 6 (M.D. Pa. March 31, 2020). His review of the safety procedures at these three immigration facilities found they were insufficient to overcome the speculative risk of infection and death for an "imminent irreparable harm" finding in the TRO context.

> The Petitioners' claim is rooted in imminent, irreparable harm. Petitioners face the inexorable progression of a global pandemic creeping across our nation—a pandemic to which they are particularly vulnerable due to age and underlying medical conditions. At this point, it is not a matter of *if* COVID-19 will enter Pennsylvania prisons, but *when* it is finally detected therein. It is not unlikely that COVID-19 is already present in some county prisons—we have before us

---

[4] Petitioners invoked the jurisdiction of the Court under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (original jurisdiction), 28 U.S.C. § 2241 (habeas jurisdiction), and Article I, Section 9, clause 2 of the United States Constitution (the Suspension Clause) (Doc. 1, p. 6).

declarations that portions of the Facilities have been put under ineffective quarantines due to the presence of symptoms similar to COVID-19 among the inmate population. Indeed, we also have reports that a correctional officer at Pike has already tested positive for COVID-19. (footnotes omitted).

. . . .

Based upon the nature of the virus, the allegations of current conditions in the prisons, and Petitioners' specific medical concerns, detailed below, we therefore find that Petitioners face a very real risk of serious, lasting illness or death. There can be no injury more irreparable.

*Thakker v. Doll*, 1:20-cv-0480, slip op. at 8,9 (M.D. Pa. March 31, 2020).

Judge Jones cites several immigration detention cases where release has been ordered. *Thakker v. Doll*, 1:20-cv-0480, slip op. at 18-20 (M.D. Pa. March 31, 2020. He balanced the public interest in continued detention this way: "Finally, the public interest favors Petitioners' release. As mentioned, Petitioners are being detained for civil violations of this country's immigration laws." *Thakker v. Doll*, 1:20-cv-0480, slip op. at 23 (M.D. Pa. March 31, 2020.

In concluding that immediate release was required in these fourteen cases Judge Jones said:

In times such as these, we must acknowledge that the *status quo* of a mere few weeks ago no longer applies. Our world has been altered with lightning speed, and the results are both unprecedented and ghastly. We now face a global pandemic in which the actions of each individual can have a drastic impact on an entire community. The choices we now make must reflect this new reality.

Respondents' Facilities are plainly not equipped to protect Petitioners from a potentially fatal exposure to COVID-19. While this deficiency is neither intentional nor malicious, should we fail to afford relief to Petitioners we will be a party to an unconscionable and possibly barbaric result. Our Constitution and laws apply equally to the most vulnerable among us, particularly when matters of public health are at issue. This is true even for those who have lost a measure of their freedom. If we are to remain the civilized society we hold ourselves out to be, it would be heartless and inhumane not to recognize Petitioners' plight.

*Thakker v. Doll*, 1:20-cv-0480, slip op. at 24 (M.D. Pa. March 31, 2020).

The language of this case is strong and persuasive in the civil detention context.[5] However, to apply this reasoning to prisons and jails across the board in all criminal cases is a much different matter. Different interests must be balanced when a criminal defendant has been detained only after a finding that no condition or combination of conditions will assure the presence of the defendant and the safety of the community. The balancing is likewise different when a criminal defendant is serving a sentence. The question of civil detention, early parole or compassionate release is not before me. This is a decision about bail during a pandemic.

---

[5] The Government appealed Judge Jones's decision to the Third Circuit and requested an administrative temporary stay. The Third Circuit granted the temporary stay request within hours. On April 21, 2020, the Third Circuit issued an Opinion concluding that it has jurisdiction to hear the Government's appeal of Judge Jones's decision. The Third Circuit will address the merits of the Government's appeal after the parties have had the opportunity to brief the issues. *See Hope v. Warden York County Prison*, No. 20-1784, 2020 WL 1922372 (3d Cir. Apr. 21, 2020).

I believe I must make an individualized determination as to whether COVID-19 concerns are compelling in a particular case to justify temporary release.

## VII.   FLIGHT RISK AND DANGER TO THE COMMUNITY

I first note that Mr. Piaquadio remains a flight risk and a danger to the community. Mr. Piaquadio has not proven by clear and convincing evidence that he is unlikely to flee or pose a danger to the safety of the community if released.

Regarding flight risk, Mr. Piaquadio argues:

> The fact that he is facing a lengthy sentence of 240 months does not by itself automatically render him a risk of flight. Significantly, Mr. Piaquadio plans to appeal the court's sentencing decision related solely to the finding of serious bodily injury. If he succeeds on appeal, and the finding of this Court as to serious bodily injury is reversed, his sentencing guideline range, without even decreasing for acceptance of responsibility, will drop to 63-78 months, taking into consideration at least 400 kg but less than 700 kg of converted drug weight. See PSR, ¶ 12; *see also*, U.S.S.G. § 2D1.1(c). This fact also provides an incentive to remain obedient to all rules of Probation and orders of Court, if released on conditions.

> . . . .

> Instantly, there is nothing in Mr. Piaquadio's life history that would suggest he presents as a serious risk of flight should he be released, with conditions, pending imposition of sentence.

(Doc. 134, pp. 4-5).

Regarding flight risk, the Government argues:

> [Mr. Piaquadio] is 63 years old and faces 20 years in prison, what might be considered a life sentence. He also has a history of chronic medical conditions that appear to have been reasonably well-managed in prison.

For the handful of misdemeanor convictions on his records, he has only ever received probation and pretrial diversion. In view of the looming 20-year mandatory minimum, his age, his medical condition, and the fact that he has never served prison time, Piaquadio has a substantial motivation to flee, rather than appear at sentencing or surrender to serve a term of imprisonment.

(Doc. 136, pp. 18-19).

Regarding dangerousness, Mr. Piaquadio argues:

Mr. Piaquadio became a danger to the community, as well as himself, after he started selling prescription drugs, primarily to buy heroin in Williamsport. After five years of imprisonment, Piaquadio no longer has the addictions which led to his criminal activities. Furthermore, if he is released on conditions, he will not be able to obtain prescription drugs, at least not without court permission, and then, in turn, sell them to buy heroin. Over time, the people to whom he sold drugs, or with whom he used drugs, are now clean (Josh Moroschok, Katelyn Piaquadio, Garrett Piaquadio), have died (Jane Flynn), or are in jail (Jon Proctor).

Neither Mary Jane Antush nor Joel Antush had any involvement with Mr. Piaquadio's drug use and/pr drug sales before he was arrested in 2015.

(Doc. 134, pp. 6-7).

Regarding dangerousness, the Government argues:

As the trial testimony established, Piaquadio sold large amounts of Oxycodone and Fentanyl patches that were prescribed to him and his now deceased girlfriend. As the Court found in finding him guilty, the use of Fentanyl sold by Piaquadio to the overdose victim caused the victim to overdose and nearly die had he not been administered Naloxone in time. Piaquadio's history of opioid addiction and his long, established pattern of selling his prescription opioid medications to drug addicts demonstrates a high risk that he will resort to that behavior if released to the community. And, as the trial evidence demonstrated,

> the risks to the safety of other individuals and the community from his trafficking in opioids, including death or serious bodily injury from drug overdoses, could not be more profound.

(Doc. 136, p. 18).

18 U.S.C. § 3142 reflects a Congressional finding that drug trafficking is a danger to the community and drug traffickers pose special flight risks. That finding has been born out in the current statistics. In the last several years, there have been thousands of drug overdose deaths in Pennsylvania: 4,516 deaths in 2016; 5,398 deaths in 2017; 4,422 deaths in 2018; and 3,811 deaths in 2019.[6] In 2018, Pennsylvania had the fourth highest rate of death due to drug overdose (36.1 per 100,000).[7] According to a DEA report, in 2018, twelve (12) people in Pennsylvania died each day due to drug-related overdose.[8] Pennsylvania has not been alone in the opioid crisis, as the death toll across the United States has been alarming. According to the CDC's national data, in the United States, there were 67,367 drug overdose deaths in 2018 and 70,699 deaths in 2017. The recent increase in drug overdose deaths has largely been attributed to opioid use – 47,600 of the 2017 overdose deaths

---

[6] Estimated Accidental and Undetermined Drug Overdose Deaths 2012 – Current, opendataPA, available at https://data.pa.gov/Opioid-Related/Estimated-Accidental-and-Undetermined-Drug-Overdos/m3mg-va8e.

[7] Drug Overdose Deaths, https://www.cdc.gov/drugoverdose/data/statedeaths.html.

[8] DEA Report available at: https://www.dea.gov/sites/default/files/2019-10/PRB%20FINAL%20--%20BUL-132-19%20Drug-Related%20Overdose%20Deaths%20in%20Pennsylvania%2C%202018.pdf .

involved opioids.[9] In Pennsylvania, the presence of an opioid was reported in 84% of overdose deaths in 2017 and 82% of overdose deaths in 2018.[10] By comparison, as of 11:00 a.m. yesterday (April 23, 2020) there have been one thousand three hundred and twenty-five (1,325) COVID-19 deaths in Pennsylvania in all of 2020.

I find the Government's arguments regarding flight risk and danger to the community to be persuasive. Thus, I find by clear and convincing evidence that Mr. Piaquadio remains a flight risk and danger to the community.

## VIII. WHETHER EXCEPTIONAL REASONS EXIST WARRANTING PRESENTENCE RELEASE OF MR. PIAQUADIO

I note at the outset that Mr. Piaquadio has not alleged that there is a substantial likelihood that a motion for acquittal or new trial will be granted. The record reflects that Mr. Piaquadio filed such Motions (Docs. 98, 99), but they were denied (Docs. 128, 129). Thus, Mr. Piaquadio seeks release due to "exceptional reasons" under 18 U.S.C. § 3145(c). As noted above, I have already found that Mr. Piaquadio remains a flight risk and danger to the community.

Mr. Piaquadio fails to clearly show that there is an exceptional reason why his continued detention is inappropriate. Mr. Piaquadio discusses the general dangers of

---

[9] From the National Institute on Drug Abuse (cited by the CDC) https://www.drugabuse.gov/opioid-summaries-by-state/pennsylvania-opioid-summary .

[10] *See* DEA Report (supra, note 6)

COVID-19, the increased risks of COVID-19 transmissions in prisons, and how he
is a high risk for infection based on his medical history.

A. SPECIAL HEALTH CONCERNS

Mr. Piaquadio alleges that his particularly vulnerable to COVID-19 based on
his medical conditions. These medical conditions include:

> narcotic dependent pain, chronic lumbosacral strain, degenerative disc
> disease, hypertension, hepatitis C, chronic liver disease related to
> hepatitis C, obesity, spinal stenosis of the left sciatica, spinal cyst,
> profound impairment to one of his eyes, chronic kidney disease (stage
> 3), high blood cholesterol, anxiety, facial nerve disorder, depression,
> alcohol dependency, degenerative arthritis, and stress related to living
> with and assisting an elderly man with dementia, and dealing with his
> son's illicit drug use . . . [and] he may have diabetes (type II).

(Doc. 134, pp. 2-3) (footnote omitted).

> In response, the Government argues:

> Piaquadio has refused medical treatment, including testing of blood
> sugar levels and other conditions, with notable regularity. Presumably,
> if his medical condition was significant enough to increase his risk of
> serious illness should he contract COVID-19, he would not be refusing
> the medical care and regular testing available at CCCF. Finally,
> Piaquadio has not shown that prison medical staff have not effectively
> managed his chronic medical conditions. . . Piaquadio's medical
> condition does not appear to expose him to any exceptional or
> extraordinary health risk.

(Doc. 136, p. 23).

We remain sympathetic to Mr. Piaquadio's concerns regarding COVID-19
and the possibility of health complications, but "[s]uch speculation does not

constitute a 'compelling reason' for temporary release." *United States v. Loveings*, Cr. No. 20-0051, 2020 WL 1501859, at *3 (W.D. Pa. Mar. 20, 2020). Mr. Piaquadio would still suffer from these chronic medical conditions if released. Mr. Piaquadio has not sufficiently demonstrated that Clinton County Correctional Facility is unable to treat and mange his medical conditions. I do not find Mr. Piaquadio's arguments regarding his specific health issues to be sufficient to establish a compelling reason for release in light of the danger to the community posed by his release and efforts taken at Clinton County Correctional Facility.

### B. SPECIFIC CONDITIONS IN THE PLACE OF DETENTION

"The Court is mindful that it bears a fiduciary responsibility to those that are detained in jails and prisons. The incarcerated look to the Courts for protection of their health, welfare and personal rights in general. However, the Courts are not on the front line. That space is rightly occupied by corrections officials and their administration."[11] The Chief Judge of this Court issued Standing Order 20-5 on March 25, 2020, requiring all detention facilities where persons are being held by order of this court to notify the Chief Judge and the judicial officer who signed the detention order if a federal detainee is in medical isolation or quarantine for any

---

[11] *United States v. Williams*, No. PWG-13-544, 2020 WL 1434130 (slip copy) (D. Md. Mar. 24, 2020).

reason.[12] As of the filing of this Opinion, no notice has been received from Clinton County Correctional Facility that Mr. Piaquadio is in medical isolation or quarantine for any reason.

The Government provided a memorandum from Clinton County Correctional Facility detailing the steps taken to protect inmates and staff from COVID-19. (Doc. 138). These precautions seem to be consistent with the CDC Guidelines for Detention Facilities.[13] The Pennsylvania Supreme Court issued an Order on April 3, 2020, directing each county president judge to work with the relevant stakeholders to fashion localized plans for dealing with COVID-19 in county jails:

> We DIRECT the President Judges of each judicial district to coordinate with relevant county stakeholders to ensure that the county correctional institutions in their districts address the threat of COVID-19, applying the recommendations of public health officials, including the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Mar. 23, 2020). If utilization of public health best practices is not feasible due to the

---

[12]    "…Further, each detention center shall promptly notify the Marshal for this District of any federal detainee who is in medical isolation or quarantine at their facility for any reason, promptly upon the entry of such detainee into such status. The Marshal shall then so notify the undersigned and the judicial officer who entered the Order of commitment of such status.
The Clerk's Office is DIRECTED to transmit a copy of this Order to the U.S. Marshal, who shall advise each involved detention center of its content, and who shall provide a copy of same to each detention center and each relevant law enforcement agency."
Standing Order 20-5, https://www.pamd.uscourts.gov/news/standing-order-2020-005 (last accessed April 4, 2020).
[13]    http://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/ guidance-correctional-detention.html.

population of the county correctional institutions, President Judges should consult with relevant county stakeholders to identify individuals and/or classes of incarcerated persons for potential release or transfer to reduce the current and future populations of the institutions during this health crisis with careful regard for the safety of victims and their communities in general, with awareness of the statutory rights of victims, and with due consideration given to public health concerns related to inmates who may have contracted COVID-19. Moreover, consistent with these above considerations, President Judges are to undertake efforts to limit the introduction of new inmates into the county prison system.[14]

Mr. Piaquadio argues generally about prison conditions and COVID-19 – e.g., the inability to follow social distancing recommendations. (Doc. 134, p. 11). Regarding Clinton County Correctional Facility, Mr. Piaquadio argues that the coming and going of staff and inmates (those finishing and starting their sentences) creates a risk of an infected individual entering the prison, as simply taking their temperatures does not account for asymptomatic carriers of COVID-19. *Id.* at pp. 13-14. Mr. Piaquadio also argues that Clinton County Correctional Facility's extended lockdown periods makes it virtually impossible for him to engage in exercise to combat his diabetes, obesity, and hypertension. (Doc. 140, pp. 8-9).

There is nothing before this Court to indicate that any specific problem has developed at Clinton County Correctional Facility. The record indicates that there

---

[14] *In Re: The Petition Of The Pennsylvania Prison Society*, No. 70-MM-2020, slip op. at pp. 2-3 (Pa. April 3, 2020) (per curiam).

are currently zero (0) confirmed cases of COVID-19 at Clinton County Correctional Facility.

C.  NUMBER OF CONFIRMED CASES

Based on the evidence before me at this time, there are zero (0) confirmed cases of COVID-19 in Clinton County Correctional Facility. In all of Clinton County, where the prison is located, there are thirteen (13) cases and zero (0) deaths, as of 11:00 a.m. yesterday (April 23, 2020). While these numbers are not guaranteed into the future, they do not suggest an immediate and unavoidable risk. Mr. Piaquadio seeks release to live with his sister in Potter County. Potter County has reported similar COVID-19 numbers, as it has reported four (4) cases and zero (0) deaths.

D.  RELEASE PLAN

Regarding his potential release, Mr. Piaquadio states:

His sister, Mary Jan Antush, has offered her residence in Galeton, Potter County, to house Mr. Piaquadio as he awaits sentence. Mrs. Antush lives with her husband Joel Antush, in a two-bedroom, three-bath house owned by them and situate (sic) on approximately 40 acres of land. The address of the property, as well as the dates of birth and social security numbers of both Mary Jane Antush and Joel Antush, have been provided to United States Probation and the United States Attorney's Office.

. . . .

Mr. Piaquadio is willing to be confined to the home of Mary Jane and Joel Antush at all times during his release. Furthermore, Mrs. Antush is

willing to drive Mr. Piaquadio to any and all probation appointments and court appointments, if necessary, although she has the technology to permit Mr. Piaquadio to appear and communicate by video and audio conference. Most importantly, Mrs. Antush is willing to serve as a third-party custodian and promises to immediately report any and all violations of release conditions to United States Probation.

Mrs. Antush has also stated she can do all of the grocery shopping, clothing shopping, and any other errands required on behalf of Mr. Piaquadio. Significantly, neither of the Antushes have criminal records and they are long-time residents of the Middle District of Pennsylvania. Finally, Mrs. Antush's residence is about 1.5 hours' drive from CCCF and she can drive Mr. Piaquadio from CCCF to her house, without the necessity of making any stops along the way.

(Doc. 134, pp. 4-6).

It appears that Mrs. Antush would be an appropriate third party custodian, but I do not find that presentence release of Mr. Piaquadio is appropriate at this time.

## IX.   CONCLUSION

For all of the reasons set forth above, Mr. Piaquadio has failed to demonstrate that he should be released presentencing. Therefore, his Motion for Release (Doc. 133) will be denied. An appropriate order follows.

Date: April 24, 2020                         BY THE COURT

                                             *s/William Arbuckle*
                                             William Arbuckle
                                             U.S. Magistrate Judge